## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

|  |  |
|---|---|
| POM OF VIRGINIA, LLC, a Wyoming limited liability company, QUEEN OF VIRGINIA SKILL AND ENTERTAINMENT, LLC, a Wyoming limited liability company, | |
| Plaintiffs, | Case No. _____ |
| v. | **JURY TRIAL DEMANDED** |
| COLEMAN MUSIC AND ENTERTAINMENT, LLC, a Florida limited liability company, | |
| Defendant. | |

## COMPLAINT

1.      This is an action for patent infringement under 35 U.S.C. § 271, *et seq*., by Queen of Virginia Skill and Entertainment, LLC d/b/a QVS ("QVS") against Coleman Music and Entertainment, LLC ("Coleman" or "Defendant") for infringement of U.S. Patent No. 7,736,223 (the "223 Patent").  A true and correct copy of the 223 Patent is attached hereto as **Exhibit A**.  This is also an action for breach of contract by QVS and POM of Virginia, LLC ("POM") (collectively, the "Contract Plaintiffs") against Defendant.

### THE PARTIES

2.      Plaintiff Queen of Virginia Skill and Entertainment, LLC is a limited liability company formed under the laws of Wyoming.  QVS maintains an office location at 5612 Eastport Blvd., Richmond, Virginia 23231.  QVS manufactures and markets computerized games of skill using patented software pursuant to a license from Savvy Dog Systems, LLC.

3.      Plaintiff POM of Virginia, LLC is a limited liability company formed under the laws of Wyoming.  POM maintains an office location at 3870 Peachtree Industrial Blvd., Suite

340-201, Duluth, Georgia 30096.

4.      Upon information and belief, Defendant Coleman Music and Entertainment, LLC is a Florida limited liability company with a principal office located at 1015 Haines Street, Jacksonville, Florida 32206.  Coleman Music and Entertainment may be served with process by service upon its registered agent, Gary Coleman, at 1015 Haines Street, Jacksonville, Florida 32206.  Upon information and belief, Coleman maintains office locations as regular and established places of business in Virginia in this judicial district and division, including a regular and established place of business in Chester, Virginia.  Defendant uses these offices and its employees to regularly and systematically conduct its business – the distribution and sale of gaming equipment – throughout the Commonwealth of Virginia, including the sale of the Contract Plaintiffs' games as well as the sale of competing games.

5.      Coleman is in the business of selling and offering for sale in the United States, including selling throughout the Commonwealth of Virginia, including in this judicial district and division, the Infringing Products, as explained in greater detail below.

6.      Coleman entered into two contracts with the Contracting Plaintiffs relating to the conduct of business in Virginia.  The first of these contracts is between POM and Coleman dated December 12, 2017 (the "First Contract").  The second is between QVS and Coleman dated January 10, 2019 (the "Second Contract").  As shown herein, Coleman's business in the Commonwealth of Virginia, including in this judicial district and division, is in breach of these contracts because Defendant's operations include the sale and distribution of games which are in competition with those of the Contract Plaintiffs.

## JURISDICTION AND VENUE

7.     This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284–85, among others.  This Court has subject matter jurisdiction over the action for patent infringement under 28 U.S.C. §§ 1331 and 1338(a), and this Court has supplemental subject matter jurisdiction over the breach of contract claim under 28 U.S.C. § 1367(a).

8.     This Court independently has subject matter jurisdiction over the breach of contract claim pursuant to 28 U.S.C. § 1332(a)(1) (diversity jurisdiction).  First, the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Specifically, Plaintiff POM seeks in excess of $75,000 for Coleman's breach of the non-compete and exclusivity rights under the First Contract, and Plaintiff QVS seeks in excess of $75,000 for Coleman's breach of non-compete and exclusivity rights under the Second Contract.

9.     Second, the claim is between citizens of different states.  For purposes of diversity jurisdiction, Plaintiff POM is a citizen of Georgia, where its members are citizens.  Likewise, Plaintiff QVS is a citizen of Georgia, where its members are citizens.  Upon information and belief, Defendant Coleman is a citizen of Florida, where its sole member, Gary Coleman, resides.

10.     Coleman has availed itself of the privilege of doing business in Virginia, including in this judicial district and division.  Coleman has a regular and established place of business in Virginia, including at least the foregoing regular and established facilities in Virginia from which Coleman operates its Virginia business.

11.     This Court also has personal jurisdiction and venue over Coleman in this action because Coleman has committed acts of patent infringement and breach of contract within the Eastern District of Virginia, Richmond Division, giving rise to this action and has established

minimum contacts with this forum such that the exercise of jurisdiction over Coleman would not offend traditional notions of fair play and substantial justice. First, Defendant Coleman has committed and continues to commit acts of patent infringement and breach of contract in this judicial district by offering for sale and selling competing games in this district and throughout the Commonwealth of Virginia, including but not limited to sales of the Infringing Products to retailers such as convenience store operators. Second, the contracts at issue arise out of Coleman's distribution of the Contract Plaintiffs' skill-based games in the Commonwealth of Virginia. In fact, the contracts relate to Coleman's distribution of the Contract Plaintiffs' skill-based games in the Commonwealth of Virginia, and nowhere else. In light of Coleman's Virginia contacts, Virginia's long-arm statute authorizes the exercise of personal jurisdiction over Coleman, and the exercise of personal jurisdiction comports with due process standards.

12. Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b) as to the patent infringement claim, because Coleman has committed acts of infringement of the 223 Patent by making, using, offering for sale and/or selling Infringing Products in this judicial district and division, where Defendant has at least one regular and established place of business.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as to the breach of contract claim, because events giving rise to the breach claim occurred in this judicial district and division. Specifically, the contract claim arises out of Coleman's sales of certain gaming equipment terminals in Virginia (and including, more specifically, in this judicial district), which constitute a violation of the non-compete and exclusivity provisions contained in Coleman's contracts with the Contracting Plaintiffs.

## COUNT I – INFRINGEMENT OF THE 223 PATENT
### (by QVS against Coleman)

14.     Plaintiffs incorporate by reference the foregoing Paragraphs 1-13 of the Complaint as if restated fully herein.

15.     Savvy Dog Systems, LLC is the record title owner of the 223 Patent.  QVS has an exclusive license in the Commonwealth of Virginia which entitles it to the substantive rights of a patent owner in Virginia, including the right to sue for and collect past, present and future damages and to seek injunctive or any other relief for infringement of the 223 Patent in Virginia.

16.     The 223 Patent lawfully issued on June 15, 2010 and was filed June 30, 2006. The 223 Patent claims priority to U.S. Application No. 11/430,770, filed on May 9, 2006, which claims priority to provisional application No. 60/788,363 filed March 31, 2006.  The 223 Patent is titled "Electronic Gaming Method and System Having Preview Screen."

17.     The 223 Patent is valid and enforceable.

18.     Michael R. Pace is the sole inventor of the 223 Patent.  He is recognized for significant accomplishments that include creating the first countertop video game, developing the first game terminal that offered multiple games in a single console, and developing the Pot-O-Gold video game.  The 223 Patent is directed to an electronic gaming terminal that generates a field of game symbols.  The individual claims of the 223 Patent determine the patent's specific scope, but in general, a game terminal has the ability to display a "preview."  The preview may be used for allowing a user to decide whether to play or not play the next active game.

19.     The 223 Patent protects one of the important features of the Tic-Tac-Fruit game that is licensed by Contract Plaintiffs to companies such as Coleman.  One of the important features of Tic-Tac-Fruit is the elimination of chance through the ability of a player to see the next game outcome on-screen before ever making a financial commitment.  This in turn

eliminated any hope of gain and in turn enhanced the appeal of the game in jurisdictions which do not permit games of chance, but do permit games of skill.

20.     The preview described in the 223 Patent may be implemented in several different embodiments.  One embodiment, among others, expressly described in the 223 Patent is directed to the game preview displayed being a results screen.  For example, the 223 Patent states "In this case, the preview screen could actually be the results screen, displaying the game outcome." (Ex. A at 11:20-22).  The 223 Patent further states, "The displayed game could actually be the result which may or may not be a winning combination of symbols."  (Ex. A at 11:48-49).

21.     The 223 Patent is directed to methods and devices that implement specific, concrete innovations in a gaming terminal.  The 223 Patent describes counter-intuitive operations, such as, "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," as recited in claim 44.  Unlike conventional gaming terminals, the claims of the 223 Patent include elements that are not well-known, generic or routine.  Prior art solutions failed to appreciate at least the overall features of the claimed invention, which represents a well-ordered combination of elements.

22.     The 223 Patent also describes "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play." Prior to the time of invention, gaming terminals such as conventional slot machines were devoid of this claim element.  It would be counter-intuitive for business and technical reasons to add this functionality.

23.     The claims of the 223 Patent encompass novel and non-obvious technology that was neither well-understood, routine nor conventional to a skilled artisan at the time of the

invention.  Such novel technology includes, but is not limited to, testing the game field and automatically displaying an actual game to be played to a player prior to initiating activation of game play.

24.     The fact that the technology claimed in the 223 Patent is not routine, generic or conventional is also illustrated by the fact that years after its March 2006 priority date, other companies in the industry were creating and seeking patents for themselves on similar technology to that of the 223 Patent, and were themselves representing to the U.S. Patent and Trademark Office that their "inventions" were, in fact, patentable (*i.e.*, novel and non-obvious). They certainly would not have spent their time, money and effort attempting to patent technology that was merely conventional, routine or generic at the time.

25.     For example, U.S. Patent No. 9,530,282 (the "282 Patent") issued on December 27, 2016 for a skill-based video game.  A true and correct copy of the 282 Patent is attached hereto as **Exhibit B**.  The 282 Patent is titled "Video Game Gaming System".  It claims a "method of adapting games of skill into a gaming machine" including the steps of accepting initiation of a play, providing one or more –single player games, evaluating and recording results, presenting a Paytable, evaluating and distributing any payout, and managing a variance of a Return To Player (RTP) of the Paytable.  (Ex. B at claim 1).

26.     The 282 Patent, which was examined by the U.S. Patent and Trademark Office years after issuance of the 223 Patent, resulted in a finding that the 282 Patent technology represented nonconventional, non-routine technology directed to providing gaming devices for playing a game of skill.

27.     Coleman has infringed and continues to infringe the 223 Patent by selling and offering to sell gaming terminal equipment in the Commonwealth of Virginia which infringes the

223 Patent.  This gaming equipment is referred to elsewhere herein as the Infringing Products.

Specifically, the Infringing Products sold and offered for sale by Coleman include electronic

video gaming terminals equipped with gaming (circuit) boards procured from Banilla Games,

Inc. of Greenville, North Carolina.  The circuit boards installed by Coleman in the Infringing

Products contain "Preview + Skill" games.  These games include such games as Lightning Skill,

Super Skill 1, Superior Skill 2, Superior Skill 3, Superior Skill: Lightning Edition, Choice Skill

1, Choice Skill 2, Choice Skill 3, Choice Skill 4 (collectively, the "Preview + Skill Games").

28.    Claim 44 of the 223 Patent is presented below with claim element designators

added in bold:

> **[44P]** An electronic gaming system comprising:
>
> **[44.1]** an electronic game terminal including a touch screen display;
>
> **[44.2]** a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:
>
> **[44.3]** constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;
>
> **[44.4]** determining at least one winning combination for each play of the game;
>
> **[44.5]** testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;
>
> **[44.6]** automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;
>
> **[44.7]** determining if the player has decided to play the displayed game; and
>
> **[44.8]** displaying an outcome resulting from play of the displayed game.

29.    Coleman offers for sale, sells, distributes and installs the Infringing Products.

30.     Referring to the preamble **[44P]** of the claim 44, as embodied in the Coleman gaming terminals including Superior Skill: Lightning Edition, these terminals are an electronic gaming system.  For example, the Superior Skill: Lightning Edition is described as follows:

> **Superior Skill: Lightning Edition** is the latest exciting addition to Banilla's Choice/Superior Skill line of games. It features 3 of our most popular classic-style nudge games from the Superior Skill Series, including Nut Shack, Silver & Gold Spins, and Double Shot, and 2 Hot Swap favorites, Bathtime Bucks and Spooky's Loot. We made these games even MORE exciting by incorporating the popular "Follow the Banana Feature," making Superior Skill: Lightning Edition the perfect addition to your route!

*See* http://www.banillagames.com/product/lightning-edition/.

31.     The Lightning Skill games also practice **[44P]**.  For example, as described on the Banilla website, "***Lightning Skill*** is a new addition to Banilla's Choice/Superior Skill line of games.  It offers 3 classic style nudge games, including *Fabulous Las Vegas, Piggy Bank or Bust,* and *Silver and Gold Spins*."  *See* http://www.banillagames.com/product/lightning-skill/.

32.     The Superior Skill 1 games also practice **[44P]**.  For example, as described on the Banilla website, "Superior Skill 1 -Superior Skill 1 has five exclusive games specially for the skill-based amusement market!  It contains 3 classic nudge games and 2 hot swap titles."  *See* http://www.banillagames.com/superior-skill/superior-skill-1/.

33.     The Superior Skill 2 games also practice **[44P]**.  For example, as described on the Banilla website, "Superior Skill 2 has five exclusive games specially for the skill-based amusement market!  It contains 3 classic nudge games and 2 hot swap titles."  *See* http://www.banillagames.com/superior-skill/superior-skill-2/.

34.     The Superior Skill 3 games also practice **[44P]**.  For example, as described on the Banilla website, "Superior Skill 3 has five exclusive games specially for the skill-based

amusement market!  It contains 4 classic nudge games and 1 hot swap title." *See*

http://www.banillagames.com/superior-skill/superior-skill-3/.

35.    The Choice Skill 1 games also practice **[44P]**.  For example, as described on the

Banilla website, "Choice Skill 1 is a three game multi-pack that includes 3 single line choice

skill games.  This game incorporates a preview and a skill task such that skill predominates over

chance!  Give us a call for more details!" *See* http://www.banillagames.com/choice-skill-1/.

36.    The Choice Skill 2 games also practice **[44P]**.  For example, as described on the

Banilla website, "Choice Skill 2 is a three game multi-pack that includes 3 hot swap titles.  Hot

swap is a new patent pending concept in which the player must choose the correct icon to

complete the proper winning pay line.  This game incorporates a preview and a skill task such

that skill predominates over chance!" *See* http://www.banillagames.com/choice-skill-2/.

37.    The Choice Skill 3 games also practice **[44P]**.  For example, as described on the

Banilla website, "Choice Skill 3 is a three game multi-pack that includes two nudge games and 1

hot swap title.  Hot swap is a new patent pending concept in which the player must choose the

correct icon to complete the proper winning pay line.  This game incorporates a preview and a

skill task such that skill predominates over chance!" *See* http://www.banillagames.com/choice-
skill-3/.

38.    The Choice Skill 4 games also practice **[44P]**.  For example, as described on the

Banilla website, "Choice Skill 4 is a three game multi-pack that includes 3 single line choice

skill games.  This game incorporates a preview and a skill task such that skill predominates over

chance!" *See* http://www.banillagames.com/choice-skill-4/.

39.    For at least these reasons, preamble **[44P]** of Claim 44 is present in the Infringing

Products.

40.     Regarding element **[44.1]** of Claim 44, as embodied in the Coleman gaming terminals including Superior Skill: Lightning Edition, each of these terminals includes "an electronic game terminal including a touch screen display."  Shown below is a user manipulating the game terminal's touch screen of the Superior Skill: Lightning Edition:



41.     Shown below is the game terminal's touch screen of the Superior Skill: Lightning Edition game:



42.     Shown below is the game terminal's touch screen of the Superior Skill 1

game, Superior Skill 2 game, and Superior Skill 3 game:







43.     Shown below is the game terminal's touch screen of the Choice Skill 1

game, Choice Skill 2 game, Choice Skill 3 game, and Choice Skill 4 game:









44.     For at least these reasons, element **[44.1]** of Claim 44 is present in the Infringing Products.

45.     Regarding element **[44.2]** of Claim 44, as embodied in the Coleman gaming terminals including Superior Skill: Lightning Edition, each of these terminals includes "a game processor for generating an interactive electronic game on the game terminal."  As shown above, each of the Preview + Skill Games of the Infringing Products receives a user's touch screen commands, processes them, and generates an output to allow for a user to interact with the game terminal.  These operations necessarily use a game processor to process the electronic inputs and generate electronic outputs that drive the touch screen display.

46.     For at least these reasons, element **[44.2]** of Claim 44 is present in the Infringing Products.

47.     Regarding element **[44.3]** of Claim 44, as embodied in the Coleman gaming terminals including Superior Skill: Lightning Edition, each of these terminals includes a game

processor configured for "constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols."  As shown below, the Superior Skill: Lightning Edition constructs a field having 3x3 array of elements for the interactive touch screen game display.  An element may be one among a set of predefined game symbols, highlighted in the red box.



48.     In the example above, the game symbols above conform to the theme of "gold and silver" and may be "a seven," "a star," "a one-bar," "a two-bar," "a three-bar," etc.

49.     Shown below, the Lightning Skill constructs a field having 3x3 array of elements for the interactive touch screen game display:



50.     As shown below, the Superior Skill 1 game, Superior Skill 2 game, and Superior

Skill 3 game each constructs a field having 3x3 array of elements for the interactive touch screen

game display:







51.     As shown below, the Choice Skill 1 game, Choice Skill 2 game, Choice Skill 3 game, and Choice Skill 4 game each constructs a field having 3x3 or 3x5 array of elements for the interactive touch screen game display:









52.    For at least these reasons, element **[44.3]** of Claim 44 is present in the Infringing

Products.

53.    Regarding element **[44.4]** of Claim 44, as embodied in the Coleman gaming

terminals including each and every one of the Skill + Preview Games, each of these terminals

includes a game processor configured for "determining at least one winning combination for

each play of the game."  As demonstrated by the foregoing screenshots above, each of the Skill +

Preview Games includes a "prize viewer" feature which illustrates the outcome of the next game

before it is played.  As a result, each of the Skill + Preview Games uses the gaming processor to

determine at least one winning combination before game play for each game.  This is discussed

in more detail with respect to the following claim elements.

54.     For at least these reasons, element **[44.4]** of Claim 44 is present in the Infringing

Products.

55.     Regarding element **[44.5]** of Claim 44, as embodied in the Coleman gaming

terminals including any of the Preview + Skill Games, each of these terminals includes a game

processor configured for "testing the game field prior to displaying the game to the player to

ensure that a winning combination more valuable than the determined winning combination is

not generated inadvertently in completing the field."

56.     Each of the Preview + Skill Games determines the prize value for the next game

in advance of game play.  When this occurs, whether the game in question is a hot swap and/or a

nudge game, the processor ensures that a winning combination more valuable than the

determined winning combination is not generated inadvertently in completing the field.

57.     For example, in the Preview + Skill Games that are nudge games, once the prize

is determined and the user chooses to play, the user interacts with the game field by "nudging" a

group of symbols higher or lower to complete the game field.  But, the game processor will have

tested the game field prior to display to ensure that, without the nudging, the game field will not

inadvertently yield a combination that is more valuable than the predetermined prize value.

58.     Shown below is an image that depicts the "nudging" interaction (red circle added for emphasis) that does not inadvertently create a winning combination greater than the prize value.



59.     To elaborate further on the operation of each of the Preview + Skill Games, if the determined winning combination were three particular symbols in a row corresponding to payout of $0.25, then, completing the game field by nudging or hot swapping will not inadvertently lead to a combination with a payout greater than $0.25.

60.     For the Preview + Skill Games that additionally or alternatively include a "hot-swap" feature, the Infringing Products test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field.  The hot-swap feature is described as follows: "Hot swap is a new patent pending concept in which the player must choose the correct icon to complete the proper winning pay line.  This game incorporates a

preview and a skill task such that skill predominates over chance!"  *See, e.g.,*

http://www.banillagames.com/choice-skill-3/.

61.     Hot-swap allows for a user to complete the game field.  Prior to displaying a game

with a hot-swap, the Infringing Products test and ensure that a hot-swap selection does not

inadvertently lead to a winning combination that exceeds the determined winning combination as

presented in the preview.  Just as with the nudge games discussed above, for the hot swap games,

testing the game field in this manner is important to ensure that the game does not yield a

combination that is more valuable than the predetermined prize value.

62.     For at least these reasons, element **[44.5]** of Claim 44 is present in the Infringing

Products.

63.     Regarding element **[44.6]** of Claim 44, as embodied in the Coleman gaming

terminals including Preview + Skill Games, each of these terminals includes a game processor

configured for "automatically displaying an actual game to be played on the touch screen game

display to a player prior to initiating activation of game play."  Shown below is an automatic

display of an actual game including, specifically, an overlaid prize viewer with interactive "press

play" language also displayed on the screen, signifying that the user has not yet initiated

activation of game play.  The user can see the game to be played, the previewed game results and

is presented the decision whether to "press play" in order to play the game.



64.     Each of the Preview + Skill Games includes a prize viewer functionality and

display screen substantially similar to the foregoing display shown.

65.     As another example, Banilla Website describes the Infringing Products as games

that "incorporate[] a preview" or "ha[ve] a preview."  *See e.g.,* http://www.banillagames.com/

choice-skill-1/; *see also* http://www.banillagames.com/choice-skill-2/;

http://www.banillagames.com/choice-skill-3/; *see also* http://www.banillagames.com/choice-

skill-4/; *see also* http://www.banillagames.com/superior-skill/superior-skill-1/; *see also*

http://www.banillagames.com/superior-skill/superior-skill-2/; *see also*

http://www.banillagames.com/superior-skill/superior-skill-3/.

66.     For at least these reasons, element **[44.6]** of Claim 44 is present in the Infringing Products.

67.     Regarding element **[44.7]** of Claim 44, as embodied in the Coleman gaming terminals including each of the Preview + Skill Games, each of these terminals includes a game processor configured for "determining if the player has decided to play the displayed game." Shown in the screenshot above, the user is presented with the option to "Press Play" on an interactive touch screen.  The game processor therefore receives inputs from the user which it processes in order to determine if the user has decided to "play" the displayed game.

68.     For at least these reasons, element **[44.7]** of Claim 44 is present in the Infringing Products.

69.     Regarding element **[44.8]** of Claim 44, as embodied in the Coleman gaming terminals including any of the Preview + Skill Games, each of these terminals includes a game processor configured for displaying an outcome resulting from play of the displayed game.  After a user hits play, the game processor of each of the Preview + Skill games performs an animation and then displays the outcome of the displayed game.  For example, in the case of each Preview + Skill Game, any prize value of a completed game is added to the user's credits and then displayed for the user to see on the screen.

70.     Below, a red circle identifies the outcome resulting from play of the displayed game of the Superior Skill: Lightning Edition, which includes an amount won and a total amount of credits as a result of the outcome:



71.    Below, a red circle identifies the outcome resulting from play of the displayed game of the Superior Skill 1 game, Superior Skill 2 game, and Superior Skill 3 game, each includes an amount won and a total amount of credits as a result of the outcome or a last won outcome:







72.     Similar to the other Preview + Skill Games, the Lightning Skill, Choice Skill 1 game, Choice Skill 2 game, Choice Skill 3, and Choice Skill 4 game, each includes an amount won and a total amount of credits as a result of the outcome or a last won outcome.

73.     For at least these reasons, element **[44.8]** of Claim 44 is present in the Infringing Products.

74.     By reason of these acts of infringement, QVS is entitled to an award of substantial damages in an amount to be determined at trial, including, at a minimum, its lost profits and/or a reasonable royalty, or both.

75.     Furthermore, QVS is entitled to injunctive relief barring Coleman from continuing to sell and offer for sale the Infringing Products.

## COUNT II - BREACH OF CONTRACT
### (by Contracting Plaintiffs against Coleman)

76.     Plaintiffs incorporate by reference the foregoing Paragraph 1-13 of the Complaint

as if restated fully herein.

77.     Both the First and Second Contracts contain an exclusivity provision giving the

Contracting Plaintiffs the exclusive rights to provide skill-based gaming products to Coleman

(also referred to in the First and Second Contracts as the "Operator").

78.     Specifically, Section 9 of the First Contract provides in relevant part:

(9) **Exclusive Provider**:  For the duration of this agreement and for any like or subsequent terms, Operator agrees that Manufacturer and Distributor its assignees and designees are the <u>exclusive providers</u> to Operator for any Commonwealth of Virginia Approved Predominate Skill Terminals to be operated by Operator, its designees and assignees within Locations as described within this agreement on Exhibit "A".  For the duration of this agreement, <u>Operator on his behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise agrees not to offer or operate a competitive product</u>.

(emphasis added).

79.     Section 14 of the Second Contract similarly provides in relevant part:

14. **Exclusive Provider**:
(a)     Operator agrees that, during the term of this Agreement, QVS, its affiliates, assigns or designees are the <u>exclusive providers</u> to Operator for any Accepted Games or other Game Product[.] . . .
(b)     <u>Operator agrees</u>, on its own behalf and on behalf of its affiliates, that it will not directly or in conjunction with any person, firm, partnership, association, corporation, or other business organization, entity, or enterprise <u>offer, provide or operate any Game Product within the Territory other than Accepted Games</u>.

(emphasis added).

80.     The First and Second Contracts also contain non-compete provisions, whereby

Coleman covenanted not to compete with the Contracting Plaintiffs by offering or providing

competing products obtained from any third party in the defined territory (Virginia).

81.     Specifically, Section 10 of the First Contract provides:

(10) **Operator:** agrees that during the term of this Agreement and for a period of twelve (12) months immediately following the termination of this Agreement for any reason whatsoever, [Coleman] shall not on his behalf or on behalf of any person, firm, partnership, association, corporation or business organization, entity or enterprise, compete with Distributor or other Operators by offering a competitive Virginia Approved or legal Predominate Skill product from any third party.

82.     Section 15 of the Second Contract provides:

15. **Non-Compete**: [Coleman] agrees that during the term of this Agreement and for a period of twelve (12) months immediately following the termination of this Agreement, for any reason whatsoever, [Coleman] shall not, on its behalf or on behalf of any person, firm partnership, association, corporation or business organization, entity or enterprise, compete with [QVS] or any of [QVS's] contracted operators by offering or providing Game Product obtained from any third party in the Territory.

83.     Starting in 2018 and continuing into 2019, Coleman has materially breached these provisions of the First and Second Contracts by selling, distributing to and installing for, *inter alia*, convenience stores and other retail locations in Virginia various gaming equipment terminals comprising a display, housing and gaming boards having central processing units loaded with firmware/software for operating a variety of games, where the gaming boards are preloaded with games supplied to Coleman by third parties (*e.g*., Banilla Games, Blue Sky, Primero, Gracie Technologies and Big Daddy Nudge) prior to the sale, distribution or installation of the terminals, as a competitive alternative to the gaming equipment terminals and associated games licensed by Contracting Parties.  For the sake of convenience, these Coleman gaming terminals described above are referred to as the "Breaching Products."  The Breaching Products include, but are not limited to, the 223 Patent Infringing Products identified in Count One above.

84.     For example, upon information and belief, Coleman also sold, distributed and installed Breaching Products at 60 Mart, 3109 Williamsburg Road, Henrico, Virginia 23231 in

violation of the First and Second Contracts.

85.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at 301 Express Deli & Exxon located at 13234 Route 301, Hanover, Virginia 23069 in violation of the First and Second Contracts.

86.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at J Express, 4317 Nine Mile Road, Richmond, Virginia 23223 in violation of the First and Second Contracts.

87.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at El Arriero Mexican Restaurant, 12204 S Crater Road, Petersburg, Virginia 23805 in violation of the First and Second Contracts.

88.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Star Express Market, 2614 New Kent Highway, Quinton, Virginia 23141 in violation of the First and Second Contracts.

89.     Upon information and belief, Coleman sold, distributed and installed Breaching Products at Holiday Food Station, 715 N. Main Street, Suffolk, Virginia 23434 in violation of the First and Second Contracts.

90.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Holiday Food Store #19 Supreme Gas Station, 1523 N. Main Street, Suffolk, Virginia 23434 in violation of the First and Second Contracts.

91.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Shell Convenience Store, 3701 Bridge Road, Suffolk, Virginia 23435 in violation of the First and Second Contracts.

92.     Upon information and belief, Coleman also sold, distributed and installed

Breaching Products at Pair Food Market, 616 Carolina Road, Suffolk, Virginia 23434 in violation of the First and Second Contracts.

93.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Sunoco Food Mart, 2700 Goodwin Blvd., Suffolk, Virginia 23434 in violation of the First and Second Contracts.

94.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Citgo Whaleyville Food Mart, 6500 Whaleyville Blvd., Suffolk, Virginia 23438 in violation of the First and Second Contracts.

95.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Kings Food Mart, 3600 Prudent Blvd., Suffolk, Virginia 23434 in violation of the First and Second Contracts.

96.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Quales Truck Stop/ BBQ, 9719 James Madison Highway, Warrenton, Virginia 20187 in violation of the First and Second Contracts.

97.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Corner Market, 145 David Bruce Avenue, Charlotte Court House, Virginia 23923 in violation of the First and Second Contracts.

98.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Denbigh Food Mart, 420 Denbigh Blvd., Newport News, Virginia 23608 in violation of the First and Second Contracts.

99.     Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Buchanan Quick Stop, 15166 Lee Highway, Buchanan, Virginia 24066 in violation of the First and Second Contracts.

100. Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Speedy 81, 15378 Lee Highway, Buchanan, Virginia 24066 in violation of the First and Second Contracts.

101. Upon information and belief, Coleman also sold, distributed and installed Breaching Products at the Valero convenience store located at 616 Carolina Road, Suffolk, Virginia 23434.

102. Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Holiday Food Store, 443 East Washington Street, Suffolk, Virginia 23434 in violation of the First and Second Contracts.

103. Upon information and belief, Coleman also sold, distributed and installed Breaching Products at Happy Shopper, 600 East Washington Street, Suffolk, Virginia 23434 in violation of the First and Second Contracts.

104. Upon information and belief, Coleman also sold, distributed and installed Breaching Products at the Sunny Quick Shop, 3000 Sinai Road, South Boston, Virginia 24592 in violation of the First and Second Contracts.

105. The First Contract in Section 5 obligates Coleman to provide a copy of a location contract to POM "prior to the installation of a terminal into a location."

106. Upon information and belief, Coleman has materially breached this provision with respect to its installation terminal equipment at certain locations – prior to providing a copy of a location contract to POM – including but not limited to:

(a) Camelot Food, 1075A George Washington Highway, Chesapeake, Virginia;

(b) 1st Stop, 2260 Executive Drive, Hampton, Virginia;

(c) Fast Trac, 501 N. Washington Highway, Ashland, Virginia; and

(d) Palmer's Grocery, 3898 Old King's Highway, Keysville, Virginia,

operating POM-affiliated gaming terminals in 2018 for which Coleman has never provided POM

with such a location contract, in breach.

107.    Additionally, the Second Contract in Section 9 states that "[n]o Accepted Game

Terminal may be installed within any Location without a fully executed [Location Agreement,]"

and requires that "[w]ithin seven (7) days after the installation of an Accepted Game Terminal

within a Location, [Coleman] must provide [QVS] with a properly completed and signed copy of

the [Location Agreement] and enter the relevant Location and Accepted Game Terminal

information into the MCM Elements database."

108.    Upon information and belief, Coleman materially breached Section 9 of the

Second Contract by failing to require its customers to execute Location Agreements and failing

to provide all Location Agreements to QVS and by failing to enter the required information into

the MCM Elements database, as contractually obligated.  For example, in 2019, Coleman failed

to provide the Location Agreement to QVS including at the following locations:

(a)  360 Express Mart, 16717 Hull Street, Moseley, Virginia;

(b)  EZ Pick, 2607 West Mercury Boulevard, Hampton, Virginia;

(c)  Market Place 6, 3019 Nine Mile Road, Richmond, Virginia;

(d)  Exxon Mart, 105 South Carter Road, Ashland, Virginia; and

(e)  Grab & Go, 1581 Darbytown Road, Richmond, Virginia.

109.    Upon information and belief, Coleman also breached Section 9 of the Second

Contract by failing to enter the required information into the MCM database, relating to at least

the following Coleman customer locations:

(a) Alan's Exxon, 8800 Quioccasin Road, Richmond, Virginia;

(b) Mobile Express III, 3401 Jefferson Davis Highway, Richmond, Virginia;

(c) 1st Stop Mart, 811A Main Street, Newport News, Virginia;

(d) Citgo Mini Mart, 2319 West Main Street, Salem, Virginia; and

(e) Williamsburg Gas and Food Mart, 4854 Longhill Road, Suite 19, Williamsburg,

Virginia.

110.     Upon information and belief, Coleman further materially breached Section 9 of

the Second Contract by installing games at certain locations, including:

(a) Sunoco, 5604 Chamberlayne Road, Richmond, Virginia;

(b) Emporia Tobacco, 600 West Atlantic Street, Emporia, Virginia;

(c) Grove & Libbie BP, 5711 Grove Avenue, Richmond, Virginia;

(d) Shell/Yess Convenience 4U, 328 Rives Road, Petersburg, Virginia; and

(e) In & Out, 3918 Oaklawn Boulevard, Hopewell, Virginia,

without first requiring such locations to execute a Location Agreement, as required by Section 9.

111.     Further, the First and Second Contracts each explicitly set forth the agreed

revenue split between Coleman, the Contracting Parties and the third-party locations where the

skill-based games are to be situated, and the First and Second Contracts include a Code of

Conduct that Coleman must adhere to in the field, which prohibit Coleman from offering sign-on

bonuses or enhanced revenue splits to a convenience store or other retail store customer as a

means of enticing them to purchase a POM-affiliated or QVS-affiliated gaming terminal.

112.     Upon information and belief, Coleman materially breached these provisions by

offering sign up bonuses and increased revenue split to third-party locations.  For example,

Coleman has offered revenue splits in excess of the permissible amounts and prohibited signing

bonuses to all Miller Mart store locations in the Tidewater, Virginia area, that are in violation of the First and Second Contracts.  By way of further example, Coleman has offered revenue splits in excess of the permissible amounts to Lucky Mart, 50 Colonial Trail E., Surrey, Virginia, in violation of the First and Second Contracts.

113.    By proximate cause of these and other Coleman breaches of contract, the Contract Plaintiffs have been damaged, and are entitled to an award of damages in an amount to be determined at trial.  The amount of these damages is no less than to put the Contract Plaintiffs in the financial position in which they should and would have been had Coleman adhered to the First and Second Contract.

114.    The Contract Plaintiffs are also entitled to an award of their reasonable attorneys' fees and costs for bringing this action to rectify the breaches of contract, pursuant to Section 14 of the First Contract (Plaintiff POM), and Section 20 of the Second Contract (Plaintiff QVS).

115.    The Contract Plaintiffs are further entitled to all other monetary and equitable relief, including specific performance, as permissible under Virginia law for breach of contract.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to enter judgment as follows:

A.      That Defendant has directly infringed the 223 Patent by making, using, selling and offering for sale the Infringing Products;

B.      That Defendant be ordered to pay damages adequate to compensate Plaintiffs for its infringement of the 223 Patent, but in no event less than lost profits and/or a reasonable royalty, together with prejudgment and post-judgment interest thereon;

C.      That Defendant be enjoined from further infringement of the 223 Patent;

D.      That Defendant has materially breached the First Contract and the Second

Contract with the Contract Plaintiffs by virtue of, *inter alia*, having sold Breaching Products, as well as other material breaches of the First and Second Contracts;

   E.  That the Contract Plaintiffs be awarded money damages from Coleman for its breaches of contract in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

   F.  That the Contract Plaintiffs be awarded their attorneys' fees and costs as prevailing parties pursuant to the First and Second Contracts;

   G.  That the case be deemed exceptional pursuant to 35 U.S.C. § 285, and further that QVS be awarded its reasonable attorneys' fees and costs from Coleman in this matter; and

   H.  That Plaintiffs be granted such other and additional relief, including equitable relief such as specific performance, as the Court deems just and appropriate.

## Jury Demand

Plaintiffs hereby demand a jury trial as to all issues so triable.

DATED this 28th day of June, 2019.

POM OF VIRGINIA LLC AND QUEEN
OF VIRGINIA SKILL AND
ENTERTAINMENT, LLC

By Counsel:

/s/ Matthew B. Kirsner
Anthony F. Troy, VSB No. 06985
Matthew B. Kirsner, VSB No. 41615
Jessica A. Glajch, VSB No. 83924
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
919 East Main Street
Suite 1300
Richmond, Virginia 23219
Telephone: (804) 788-7752
Fax: (804) 698-2950
ttroy@eckertseamans.com
mkirsner@eckertseamans.com
jglajch@eckertseamans.com

Steven G. Hill, GA Bar No. 354658
John L. North, GA Bar No. 545580
Vivek Ganti, GA Bar No. 755019
Martha L. Decker, GA Bar No. 420867
(*applications for admission pro hac vice to
be filed*)
HILL, KERTSCHER, & WHARTON, LLP
3350 Riverwood Parkway
Atlanta, Georgia 30339
Telephone: (770) 953-0995
Fax: (770) 953-1358
sgh@hkw-law.com
jln@hkw-law.com
vg@hkw-law.com
md@hkw-law.com

Counsel for Plaintiffs POM of Virginia
LLC and Queen of Virginia Skill and
Entertainment, LLC